## 24th JUDICIAL COURT FOR THE PARISH OF JEFFERSON
## STATE OF LOUISIANA

### SEARCH AND SEIZURE WARRANT
*******************

AFFIDAVIT(S) HAVING BEEN MADE BEFORE ME BY **DETECTIVE BRIAN RICO**, of the Gretna Police Department, that he has good reason to believe that on or in the premises of 28 8TH Street #B in Gretna, Louisiana 70053 which is a single story double residence constructed of tan brick, white trim, brown shingle roof with the front door being dark brown with "B" on it facing north. "218" does not appear on the residence from the street view, but the residence sits next to 216 8TH Street. The search is for the residence of 218 8TH #B Street including all curtilage within the survey property lines 218 8th Street #B in Gretna, Louisiana 70053.   218 8th Street located in the City of Gretna within the Parish of Jefferson, State of Louisiana, there is now being concealed certain property, namely, Controlled dangerous substances, more specifically Crack Cocaine; any instrumentality's employed in its use, packaging and distribution; any documentation regarding residency or associated with narcotic trafficking; and any assets, including currency, which may be the proceeds of the narcotics trafficking, ledgers, and any electronic communication devices, or electronic storage devices and all data stored within which said property constitutes evidence of the violation of Title 40 of the Louisiana Revised Statutes, and as I am satisfied from the affidavit(s) submitted in support of the application for this warrant that there is probable cause to believe that the aforesaid property is being concealed on the premises above described, and that the aforesaid grounds for the issuance of this search and seizure warrant exist:

**YOU ARE HEREBY ORDERED** to search forthwith the aforesaid premises for the property specified serving this search and seizure warrant and making the search during the daytime or the night time, Sundays or holidays, and if the property be found there, to seize it, leaving a copy of this warrant and a receipt for the property seized, to make your written return on this warrant including a written inventory of the property seized, and to bring the said seized property before me within ten (10) days of this date, as required by law.

JEFFERSON PARISH, LOUISIANA
DATED THIS 7 DAY OF Nov , 2011.

_____
24TH JUDICIAL COURT,
PARISH OF JEFFERSON,
STATE OF LOUISIANA

Caroline Ann
Criminal Commissioner
24th Judicial District Court

COPIES:
1 - Person Upon Whom Warrant is Served
1 - Judge Signing the Warrant
1 - District Attorney
1 - Records Division



GPD 04948-WB

1

```
 1           UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3
 4   DENISE BAILEY, DANIEL      * CIVIL ACTION
     JACKSON, RALPH JACKSON,    * NO. 12-2795
 5   DORIS J. USSIN,            *
     LYNNETTE BULLOCK, RICKY    *
 6   BULLOCK and THERESA        * JUDGE JANE
     BULLOCK JOHNSON,           * TRICHE MILAZZO
 7   individually and on        *
     behalf of their            *
 8   deceased mother, WILLIE    * SECTION "H" (2)
     NELL BULLOCK               *
 9                              *
                                *
10   VERSUS                     *
                                *
11                              *
     NEWELL NORMAND, THE        *
12   JEFFERSON PARISH           *
     SHERIFF'S OFFICE,          *
13   ARTHUR S. LAWSON, JR.,     *
     GRETNA POLICE              *
14   DEPARTMENT, AND            *
     DEPUTIES SCOTT VINSON,     *
15   JAMES PRICE AND RUSSELL    *
     LLOYD                      *
16                              *
     ****************************
17
18
           Deposition of SCOTT VINSON,
19   200 5th St., Gretna, Louisiana 70053, taken
     in the offices of the Gretna Police Station,
20   201 Fifth Street, Gretna, Louisiana on
     Tuesday, the 26th day of August, 2014 at
21   10:41 a.m.
22
23
24
25
```

McKenzie & Associates, Inc.
2817 Harvard Avenue - Suite 202
Metairie, Louisiana 70006
Tel: (504) 888-2551   Fax: (504) 888-2554



```
 1           MR. BETZER:
 2                We're going to need the SRT policy.
 3                We call for production of it.
 4     EXAMINATION BY MR. BETZER:
 5           Q.   Now, are you familiar with that
 6     policy?
 7           A.   Yes, sir.
 8           Q.   And you're right, I think of TV, I
 9     think of military advanced training people
10     when I think of the SRT.  Tell me how I'm
11     incorrect in thinking that when the unit that
12     entered Miss Bullocks's house is not a
13     highly-trained combat-fatigue-wearing,
14     mask-wearing, carrying advanced weaponry,
15     arriving in an ambulance is different than
16     what most people or what I'm thinking of when
17     I think of SWAT?
18           MR. LEVENSON:
19                I object to form.  And I object to
20                it's assuming facts not in
21                evidence.  You can answer.
22     EXAMINATION BY MR. BETZER:
23           Q.   You understand what I'm saying?
24           A.   We didn't utilize special weapons
25     that day.  We didn't utilize any distraction
```

1  devices.  We didn't utilize any breaching
2  tools.  We didn't utilize any CS gas.  We
3  didn't utilize any smoke.  So you're wrong.
4  As a matter of fact, we utilized our hand
5  held service weapons.  The only thing
6  different, because I bet you've never seen
7  anybody show up in an ambulance before.  So
8  you're wrong.
9       Q.    No.  That's the first time.
10      A.    The only thing different was the
11 uniform.  We didn't utilize any special tools
12 whatsoever.
13      Q.    Well, there was an officer who
14 had --
15      A.    Outside.  Never went inside.
16      Q.    And they did draw their weapons,
17 right?
18      A.    Oh, yes, sir.
19      Q.    And they did wear masks and
20 goggles?
21      A.    No, sir.  Not all of them.
22      Q.    Some that entered the house did?
23      A.    That's a personal choice, sir.  I
24 understand, but not all of them.
25      Q.    In fact, I saw no reason to have a

23

1    SWAT team to begin with. Tell me why it was
2    important to have a SWAT team there to begin
3    with. If you didn't use grenades, flash pan
4    grenades, and you didn't need the long rifles
5    inside the house, why did you feel it was
6    necessary to use SRT to begin with?
7          MR. LEVENSON:
8          Let me object to you expressing
9          your opinions being irrelevant.
10         Answer the question.
11         THE WITNESS:
12         We utilized a threat assessment,
13         which involves criminal history,
14         background checks, intelligence,
15         whether that be confidential or
16         not, which it's sensitive. Some of
17         the material is sensitive.
18         But we create a threat assessment
19         based on all those things that I've
20         told you, but, in addition to this,
21         because of Miss Bullock's condition
22         in consulting with the
23         administration, we thought it was
24         the safest tool to use.
25    EXAMINATION BY MR. BETZER:

```
 1       Q.    The SRT was the safest tool to use?
 2       A.    Absolutely.  The combination of the
 3  two now, sir.  You can't dismiss the first.
 4       Q.    I understand what you're saying.
 5  So let's talk about threat assessment for
 6  this particular incident.  What was the
 7  threat assessment?  What threats did you
 8  perceive going into this?
 9             MR. LEVENSON:
10                  Let me interpose an objection that
11                  I will allow him to respond to that
12                  question provided it does not
13                  reveal or endanger the identity of
14                  any confidential informants if
15                  involved or identify any
16                  information that is part of a
17                  continuing ongoing criminal
18                  investigation.  Other than that,
19                  have at it.
20  EXAMINATION BY MR. BETZER:
21       Q.    All right.  I don't want you to
22  reveal any confidential informants.
23       A.    And I can't.
24       Q.    Did any confidential informant tell
25  you that there would be weapons in the house?
```

```
 1              MR. LEVENSON:
 2              You might want to reask the
 3              question.  Did he have any
 4              information that there were weapons
 5              in the house.  Can we do it that
 6              way?  Then we will talk about what
 7              you can ask after that.  Let's
 8              start off with if anybody told him
 9              there would be weapons in the
10              house.
11  EXAMINATION BY MR. BETZER:
12       Q.    Did anyone give you information
13  that led you to believe there would be
14  weapons in the house?
15       A.    I'm going to answer you, but I have
16  to be careful as well.  I mean, because I
17  want to be as forthcoming with you as I can,
18  but at the same time like --
19       Q.    I understand.
20       A.    I can't give up certain
21  information. And again, we all know the
22  outcome that at the end of the day there was
23  not.  That doesn't change what I'm going to
24  try to tell you.
25              Based on the target Ralph Jackson's
```

1  criminal history, which has violence inside
2  of it, documented violence, certain facts
3  provided by a confidential informant, a
4  history with this family who occupies that
5  entire block threatening police officers,
6  threatening them when they catch them off
7  duty what they're going to do to them and so
8  forth, they've had several encounters with
9  the policemen, when you add all those factors
10 together, and at that particular time not
11 knowing how many people occupied the house
12 because frequently, on a regular basis, the
13 house would be, sometimes it would be empty,
14 sometimes it would be full.  Some would be
15 family, some wouldn't be family.  And that
16 was kind of a point all along this way or in
17 the beginning of this thing is a lot of the
18 individuals loitering on that property didn't
19 even belong there.  So they were an unknown
20 as well.
21             So when you factor all that
22 together, it met what we felt we needed in a
23 threat assessment, but then we added to it
24 the part where I told you about the safety
25 and the precision.  It was paramount,

1  paramount, that we get into that residence
2  and be able to secure it with Miss Bullock
3  not being harmed.  It was known that she
4  wasn't the target, but, at the same time
5  while executing it, not knowing exactly who
6  was in that house.  She was never the target.
7  She, unfortunately, because she resides
8  there, she had never at any point in this
9  thing was the target of this.  Unfortunately,
10 for us, she was there because she lives
11 there.  So we had to be able to work around
12 that.
13              We were very well aware of her
14 health condition.  We were well aware of her
15 age.  I couldn't have stressed that enough in
16 my briefings.  Now, whether they like it or
17 not, whether they like me or not is
18 irrelevant.  I had worked that beat for many,
19 many years.  I knew who that woman was and I
20 understand, for whatever reason, their
21 disdain or whatever for the police.  It did
22 not eliminate the fact that I was aware of
23 who she was and that she, in fact, lived
24 there, but at no time did we ever thought she
25 was involved in drug dealings.  We had to

|   |   |
|---|---|
| 1 | work around her and, at the same time, not |
| 2 | knowing who else occupied that house at that |
| 3 | time.  It is very important.  And it was |
| 4 | important to the chief and it was important |
| 5 | to me.  And that was in addition to the |
| 6 | threat assessment that was completed. |
| 7 | Q.   But you did believe Ralph Jackson |
| 8 | was involved in drug dealing, right? |
| 9 | A.   The information that was delivered |
| 10 | to me, yes, sir. |
| 11 | Q.   And Nathaniel Meredith was involved |
| 12 | in drug dealing? |
| 13 | A.   I don't recall.  You'd have to ask |
| 14 | the bureau about that.  I don't know that he |
| 15 | was a resident, a listed resident, at that |
| 16 | location.  I'm not sure.  I knew about Ralph. |
| 17 | Q.   And you did know other members of |
| 18 | this family prior to this incident on a |
| 19 | personal level? |
| 20 | A.   Oh, yeah.  Yeah. |
| 21 | Q.   How far do you go back with this |
| 22 | family? |
| 23 | MR. CHRISTIANA: |
| 24 | Forever. |
| 25 | THE WITNESS: |

```
 1              in evidence.  Answer as best you
 2              can.
 3              THE WITNESS:
 4              I had seven men enter that house.
 5              Not 20.  So you're wrong.
 6   EXAMINATION BY MR. BETZER:
 7        Q.    Okay.
 8        A.    I can't send seven men to this
 9   location and not, under any circumstances,
10   not check that house for any potential
11   threats.  I told you, there's been many a
12   days that the yard is full, the house is full
13   and there's days that there is barely anybody
14   there.  There was no way of telling, at that
15   particular time, for me and my men who was in
16   that house and who was not in that house.
17        Q.    I understand you were head of the
18   SRT team, but the SRT team wasn't the only
19   people that participated in the execution of
20   this warrant, is that right?
21        A.    The SRT team secured that residence
22   and turned it over to the bureau.  We left.
23        Q.    So it was just the SRT team's job
24   to secure the residence?
25        A.    That's correct, sir.
```

```
 1      Q.   Okay.  And the information you had
 2  going in, you knew Miss Bunny's condition.  I
 3  think you already said that.  You were not
 4  aware of anyone else being in there, but you
 5  didn't know, correct?
 6      A.   But you didn't know.
 7      Q.   Okay.  And in addition to your
 8  members entering, there were some other
 9  people that entered the house.
10      A.   Sir, nobody was allowed to enter
11  that house until my men secured it.  As they
12  came out, it was turned over to the bureau
13  and my men left.
14      Q.   Okay.  Did you ever enter the
15  house?
16      A.   No, sir.
17      Q.   When your men finished securing it,
18  did they escort Miss Bunny out?
19      A.   Sergeant Zemlik, I don't know
20  what's the best way -- she come walking out
21  the house.  Zem said he reached over, saw
22  there was a metal folding chair leaned up
23  against, I think, the house next door, I'm
24  not quite sure.  Unfolded it, set it out in
25  front of the house and let her sit it out.
```

1  Q.   Did any of the members on your team
2  tell you at any time that Miss Bunny resisted
3  or refused to get out the house?
4  A.   Oh, no, sir.
5  Q.   Did you personally witness her not
6  cooperate with any command or anything?
7  A.   No, sir.
8  Q.   Okay.  Did you personally witness
9  any of the persons of interest or people on
10 the front lawn resist arrest?
11 A.   Again, I can put you there, if you
12 want me to.
13 Q.   I'm asking if you personally
14 witnessed any of that.
15 A.   I told you, as soon as we pulled
16 up -- it's kind of hard for me to answer that
17 question because you will say how could you
18 not see because I know that's where you're
19 going, but I want to kind of put you there.
20      Listen, when Dustin Vinet gave the
21 signal that he had the alleyway secured, I
22 immediately opened up the back door for the
23 men.  Directed my attention straight to those
24 children.  I gathered these children.  I told
25 them to calm down, it was going to be all